## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MONA C. GRANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-CV-386-PJC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Mona C. Grant ("Grant"), pursuant to 42 U.S.C. § 405(g), requests judicial

review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying her applications for benefits under the Social Security Act, 42 U.S.C.

§§ 401 *et seq.*  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to

proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the

Tenth Circuit Court of Appeals.  Grant appeals the decision of the Administrative Law Judge

("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that she

was not disabled.  For the reasons discussed below, the Court **REVERSES AND REMANDS**

the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting
Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as
Defendant in this action.  No further action need be taken to continue this suit by reason of the
last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Grant was 44 years of age on the date of the administrative hearing on September 16, 2010.  (R. 42).  She was 5' 6 1/2" tall and weighed 220 pounds.  *Id.*  Her weight fluctuated between 141 pounds and 220 pounds.  (R. 42-43).

Grant had worked as a habilitation training specialist, home healthcare coordinator, and house supervisor taking care of individuals with disabilities.  (R. 34-38).  Grant assisted disabled individuals with their daily living skills and with physical therapy.  (R. 36).  She had also worked as a machine operator.  (R. 37).  Each of these jobs had required her to do heavy lifting.  (R. 35-39).

Grant had been diagnosed with fibromyalgia in late 1990, but she had continued to work following her diagnosis.  (R. 40).  She said that she was in pain all day every day, and some days her pain was worse than others.  (R. 51).  In January 2004, she suffered an on-the-job injury and had to stop working.  (R. 38).  She experienced pain in her neck, shoulder, and left arm.  (R. 38-40).  She described numbness in her left arm that extended down to her fingertips.  (R. 39).  Her left shoulder was always swollen and irritated.  (R. 40).  She was unable to lift her left arm above her head.  (R. 39).  Grant said that she suffered continuous back pain.  (R. 47).  It was painful for Grant to sit and to have any pressure placed on her back.  *Id.*  Grant described her pain as chronic, and she said that it increased every year.  (R. 58).

Grant had suffered headaches after a severe automobile accident in 1995.  (R. 43).  Her headaches occurred once or twice a month and lasted for hours.  (R. 44).  When her headaches occurred, she had to lie down in a dark room with a cold towel on her forehead.  *Id.*  She believed that changes in the weather and allergies might contribute to her headaches.  *Id.*  Grant had bronchial asthma since birth.  (R. 44).  She had to use two inhalers, nose pumps, medication, and

breathing treatments three times a day.  (R. 44-45).  Grant testified that her doctor did not want her to go out of the house from 10:00 a.m. to 8:00 p.m. during allergy season because of her asthma and allergies.  (R. 45).

Grant testified that she had chronic swelling in her ankles and hands.  (R. 45-46).  She also had arthritis in the first three fingers of her right hand that caused them to swell.  (R. 41).  The swelling in her hand made it hard for her to write in the morning, but it got better as the day progressed.  *Id.*  She could write for 20 to 30 minutes at most.  (R. 41-42).  She had to get help completing her Social Security paperwork.  (R. 42).  She felt these limitations would prevent her from going back to work as a program coordinator.  *Id.*

Grant testified that she had tried physical therapy, but she stopped because the equipment irritated her skin.  (R. 55).  Though it had been recommended that she do water aerobics, she said that she did not have access to a pool.  *Id.*  She had tried injections in her neck, arm, shoulder, and back that provided her about two-and-a-half weeks of relief.  (R. 55-56).  She had been advised that the injections were not worth continuing because they provided only slight relief.  (R. 56).

Grant testified that she had a long history of depression.  (R. 54).  When she was depressed she would stay in her room all day and would sometimes not eat.  *Id.*  She took medication for her symptoms, but she felt that only partially helped her.  *Id.*  She had never seen a counselor for her symptoms because she was unable to afford one.  (R. 54-55).

Grant said that she had problems with insomnia and was placed on medications.  (R. 50).  The side effects of her medications made her drowsy and made her mouth dry.  (R. 56).  She said that she ate bags of ice daily.  *Id.*  During the hearing, she said that she could hardly talk because her mouth was "like glue."  (R. 44).

3

Grant testified that she only left her house once or twice a month.  (R. 49).  She spent three days a week in bed because of her pain and swelling.  (R. 50, 54).  Due to problems with pain and insomnia, Grant typically could not get to sleep until 4:30 a.m., but she was awake by 8:30 a.m.  (R. 50, 56).  She took her medications when she woke, but it was around 2:00 p.m. before they helped.  (R. 53).  When she got up, she watched television, talked on the telephone, and used the computer.  (R. 53-54).  She drank beer on the weekends, and she smoked a pack of cigarettes per day, although her doctor had recommended that she stop.  (R. 56-57).

Grant testified that she had been given a five-pound lifting restriction after her fibromyalgia diagnosis.  (R. 40-41).  Grant could lift her purse, but was unable to lift a gallon of milk.  (R. 42).  She could sit for 20 to 30 minutes before needing to shift positions due to pain in her hip.  (R. 46).  After standing for longer than 20 to 40 minutes, Grant felt dizzy and had pain in her low back so she would have to sit down.  (R. 47-48).  Grant said that after walking half a block "everything" would start to hurt and she would "be dying trying to make it back to the house."  (R. 48).  She had trouble going up stairs, but she had no trouble going down them.  *Id.* She was able to cook and to clean the dishes, but she did not like to stand to accomplish these tasks.  (R. 51-52).  She was unable to clean the bathroom because the fumes exacerbated her allergies.  (R. 52).  Other than curling her hair, she had no problems caring for her personal grooming needs.  (R. 46).  She was able to drive, although it caused her to have sharp pain in her back and her sides that would persist for two to three days afterwards.  (R. 49).  She did not shop because it was difficult for her to walk the store aisles.  (R. 57).  She said that she was no longer able to take care of her grandchildren because she could not keep up with them and because it was too painful.  (R. 53).

Grant told the ALJ that when she had attempted to return to work, she had been told that she could not take her medications. (R. 58). She said that she had to take her pain medications to be able to function. *Id.*

Gerald R. Hale, D.O., F.A.O.C.A, of Tulsa Integrated Pain Services examined Grant on October 19, 2004. (R. 214-16). Grant told Dr. Hale that she had continuous pain in her back and shoulder, as well as intermittent pain in her left elbow that went down to her pinky of her left hand. (R. 214). She reported problems with rashes and swelling. *Id.* She said that she was unable to stand, walk, or drive for more than 30 minutes without having severe pain in her upper and left parascapular region and left lower back region. *Id.* Dr. Hale prescribed Neurontin on a trial basis for fibromyalgia and recommended that she start an exercise program. (R. 215). He recommended restrictions of "10 pound restricted lifting continuously, 10 pounds restricted pushing and pulling continuously with recommendations not to bend or over utilize her left upper extremity." (R. 216).

On November 30, 2004, Grant returned to Dr. Hale with chief complaints of left parascapular pain, chronic low back pain, and history of fibromyalgia. (R. 212-13). Dr. Hale wrote that Grant's subjective complaints of pain seemed out of proportion with her general condition and her physical capabilities. (R. 212).

On February 2, 2005, Grant told Dr. Hale that she was unable to do anything and that she spent most of her time in bed. (R. 210-11). She reported swelling and problems with dryness and thirst. (R. 210). He adjusted several of her medications and recommended that Grant participate in aquatic therapy or a physical conditioning program. (R. 211).

Terry M. Gile, D.O., of Tulsa Integrated Pain Services saw Grant for routine follow-up evaluation in March, May, and June 2005. (R. 207-09). Grant reported continued pain, and Dr.

Gile made adjustments to her medications.  *Id.*  He also recommended that Grant participate in aerobic exercise.  *Id.*

On March 9, 2006, Grant returned to see Dr. Gile, and she reported that her pain medications provided significant relief without side effect and increased her restful sleep.  (R. 206).  He refilled her medications and again recommended that she do aerobic exercise.  *Id.*

When Grant saw Dr. Gile on July 27, 2006, she was taking Lortab, Tramadol, Cymbalta, and Trazodone for pain.  (R. 205).  She continued to have chronic pain and problems sleeping. *Id.*  Dr. Gile's findings included a "severe" amount of tenderness upon palpation of Grant's knees, elbows, and back.  *Id.*  Dr. Gile adjusted her medications, and encouraged her to try biofeedback, cognitive therapy, active aerobics, and a muscle stimulator.  *Id.*

Candy N. Ting, D.O., examined Grant on January 25, 2008.  (R. 285-86).  Grant's blood pressure was 122/81, her pulse was 81, and she weighed 157 pounds.  (R. 286).  Grant reported that she had experienced severe headaches and generalized fibromyalgia pain following her motor vehicle accident.  (R. 286-87).  Grant's past medical history reflected that she had chronic multiple joint pain with negative rheumatoid factor.  (R. 287).  She told Dr. Ting that her fibromyalgia was getting worse and that she was having pain all over.  (R. 285).  Dr. Ting recommend that Grant start a regular exercise program.  (R. 287).

Grant presented to Dr. Ting on September 12, 2008 for complaints of a flare-up of multi-site fibromyalgia pain.  (R. 277, 281).  She had difficulty sleeping, sinus congestion, and a cough. *Id.*  She reported that she was in so much pain that she had quit working and had filed for disability.  (R. 277).  Grant said she had stopped taking all her medications and was taking Aleve due to her lack of insurance.  *Id.*  On examination, Grant had positive fibromyalgia tender points. (R. 278).  Diagnoses were fibromyalgia, fatigue/malaise, insomnia not otherwise specified, and

major depressive disorder.  (R. 279).  Dr. Ting's plan of care recommended that Grant begin a

regular exercise regime with water aerobics.  *Id.*

Grant presented to Dr. Ting on October 23, 2008 for complaints of shooting pain in her

hands, arms, and legs.  (R. 274).  Assessments included acute bronchitis, unspecified myalgia

and myositis, and fibromyalgia.  (R. 276).  On December 5, 2008, Grant told Dr. Ting that she

was always in pain and that her pain made it hard for her to get out of bed.  (R. 267).  Dr. Ting

noted that Grant appeared depressed, anxious, and worried.  (R. 269).  Dr. Ting diagnosed back

muscle spasms; acute bronchitis; arthralgia of joints; abnormal blood chemistry; and unspecified

myalgia and myositis.  *Id.*  Dr. Ting refilled Grant's prescriptions, and she injected Depo Medrol.

(R. 265, 270).

On March 18, 2009, Grant presented to Dr. Ting for muscle spasms and joint aches.  (R.

249).  She reported that she was in pain every day and all day.  *Id.*  Her muscles were sore

because she was lifting and providing care for her young grandchildren.  *Id.*  Grant presented to

Dr. Ting on May 26, 2009 for complaints of swelling in her right hand.  (R. 238).  She also

complained of continued pain in her shoulders, back, and arms.  *Id.*  She said that she took care

of her grandchildren and needed more pain medication in order to carry and lift them.  *Id.*  She

reported no effects of drowsiness with her pain medication.  *Id.*  She continued to smoke

cigarettes and to drink alcohol.  (R. 239).  On examination, Dr. Ting apparently found that

"involved joints" were Grant's hands, shoulders, elbows, and wrists.  (R. 240).  Dr. Ting

discussed with Grant the possible risk of addiction to pain medication and the risk of using it

while taking care of her grandchildren.  *Id.*  Dr. Ting encouraged Grant to rest her joints when her

symptoms were bad.  *Id.*  X-rays of Grant's right hand and wrist were normal.  (R. 305-06).  Dr.

Ting's assessment was unspecified hand arthritis; osteoarthritis; fibromyalgia; unspecified

myalgia and myositis; reactive depression; dysthymic disorder[2]; allergic rhinitis, not otherwise specified; and neuropathy.  *Id.*  Dr. Ting refilled Grant's medications.  (R. 241).

On June 15, 2009, a nurse practitioner in Dr. Ting's office treated Grant for bronchitis and sinusitis, not otherwise specified.  (R. 234-36).  On July 10, 2009, assessments included fibromyalgia, arthralgia, and anxiety.  (R. 224).  Dr. Ting's treatment plan included biofeedback, regular exercise routine, and warm heat on Grant's joints and muscles.  *Id.*  On several occasions from June 2009 through October 2009, Grant telephoned Dr. Ting's office requesting additional quantities of Lortab.  (R. 229-31, 341-42, 345, 353-55).

Grant presented to Dr. Ting for complaints of excessive pain on September 1, 2009.  (R. 348-52).  Grant reported that she spent a lot of her time in bed.  (R. 348).  She said that she could hardly watch her grandchildren due to her pain.  *Id.*  She continued to smoke cigarettes and drink alcohol.  (R. 349).  Grant reported that she took her medications as prescribed and had no side effects.  *Id.*  Grant's score on a mood disorder questionnaire indicated severe to extreme depression.  (R. 351).  Dr. Ting diagnosed fibromyalgia; reactive depression; fatigue/malaise; insomnia; unspecified asthma; and stress situation.  *Id.*  She recommended that Grant participate in a regular exercise regimen with water aerobics and that she lose weight.  *Id.*  Dr. Ting adjusted Grant's medications.  (R. 352).

Grant was seen by a physician's assistant at Dr. Ting's office on December 3, 2009.  (R. 375-78).  She reported having a one-month onset of pain in her left hip and low back that radiated down her left leg.  (R. 375).  Cold weather made her pain worse.  *Id.*  Pain medication provided her minimal relief from pain.  *Id.*  Grant did not want to do physical therapy because it

---

[2] Dysthymic/dysthymia is a chronic, mild form of depression that has been present for at least two years.  Taber's Cyclopedic Medical Dictionary 594 (17th ed. 1993).

made her back pain worse, and she did not want to do pain management because she felt like she

was on too much medication.  *Id.*  A lumbar spine x-ray performed that day revealed:

> There appear to be only four lumbar type vertebra[e].  There appears to be mild
> amount of dextroscoliosis involving the thoracolumbar region of the spine.  There
> appears to be some degenerative changes involving the lumbar facet joint regions.
> The lumbar disk spaces appear to be fairly well-maintained.  There appears to be
> some bony demineralization involving all of the visualized bony structures.

(R. 398).  A pelvis and left hip x-ray showed mild bilateral arthritic changes and "[s]ome bony

demineralization involving all of the bony structures."  (R. 399).  Grant was diagnosed with

sciatica, acute urinary tract infection, and low back pain.  (R. 377).

Grant presented to Dr. Ting on March 5, 2010, for a referral to a pain management doctor.

(R. 413).  She complained of all-over body pain.  *Id.*  Grant had positive tender points.  (R. 415).

Dr. Ting treated Grant with medications for acute sinusitis; allergic rhinitis; fever blisters;

asthma; back pain; fibromyalgia; and depression.  (R. 416).

At Grant's appointment with Dr. Ting on May 3, 2010, she weighed 210 pounds, her

blood pressure was 155/95, and her pulse was 118.  (R. 407).  Dr. Ting's assessments were

pharyngitis; strep; unspecified asthma; unspecified myalgia and myositis; and elevated blood

pressure without hypertension.  *Id.*  Grant was instructed to eat a low sodium diet and was

educated on hypertension.  (R. 408).

When Grant presented to Dr. Ting on June 29, 2010, she requested extra pain medication

because she was lifting and providing care for her mother and her grandchildren.  (R. 400-03).

She reported that she was crying all the time.  (R. 400).  She had problems sleeping but did not

want to take her sleep medication because she had to take care of her mother.  *Id.*  She continued

to take her medications as prescribed, but she felt that they were not effective.  (R. 401).  Dr.

Ting's assessments were fibromyalgia; arthralgia; reactive depression; stress reaction; long-term

use of high risk medication; fatigue/malaise; sleep deprivation; and anxiety.  (R. 402).  Dr. Ting

advised Grant that her medication requests were unreasonable and too risky.  (R. 403).  She

discussed with her that not sleeping could cause her fibromyalgia to flare up.  *Id.*  Dr. Ting

increased the dosage of Grant's medications.  *Id.*  She again recommended that Grant participate

in a regular exercise regime with water aerobics.  *Id.*

Dr. Ting's October 1, 2010 progress note reflects that Grant continued to report having

all-over pain.  (R. 444-47).  The pain was worse in Grant's arms and elbows, and she had

difficulty straightening out her arms.  (R. 444).  She was taking her medications as prescribed

without any side effects.  *Id.*  She was not checking her blood pressure.  *Id.*  Dr. Ting assessed

fibromyalgia; arthralgia; intrinsic asthma, not otherwise specified; neuropathy; anxiety disorder;

depression, reactive; long-term use of high risk medication; and fatigue/malaise.  (R. 446).

Michael D. Morgan, Psy.D., performed a consultative psychological examination for the

agency on October 17, 2007.  (R. 217-20).  Grant reported problems with fatigue, anxiety,

depression, and irritability.  *Id.*  She had difficulty going to sleep and staying asleep.  (R. 218-19).

She had a low energy level and low interest in pleasurable activities.  (R. 218).  She had anxiety

and depression that she felt were because of her health problems.  *Id.*  She told him that she had

stopped taking her anti-depressant medication because she could not afford it.  (R. 217).  Grant

reported that she regularly socialized with her family and friends, watched television, played

computer games, and took walks.  *Id.*  She was able to do household chores, but it took her a long

time to complete them.  *Id.*  Dr. Morgan found that Grant's memory, concentration, and thought

processes were normal and that she had a high-average level of intelligence.  (R. 219).  His Axis

I[3] diagnosis was adjustment disorder with mixed anxiety and depressed mood, chronic, and

Grant's Global Assessment of Functioning ("GAF")[4]  was scored as 66-70.  (R. 220).  Dr.

Morgan's prognosis was that with appropriate treatment Grant could be restored to her pre-

morbid level of psychological functioning in less than one year.  *Id.*

A physical examination was performed by agency consultant Patrice Wagner, D.O., on

September 24, 2009.  (R. 309-16).  Grant's chief complaints were multi-site pain with

fibromyalgia, and pain and numbness in her left arm and hand.  (R. 309).  She told Dr. Wagner

that she was in "severe pain 24 hours a day."  *Id.*  Grant could perform light housekeeping

chores, but depended on her daughter for most things.  *Id.*  She completed her activities of daily

living independently.  *Id.*  She reported that she drank 6-7 beers daily and smoked 1 pack of

cigarettes a day.  *Id.*  During Dr. Wagner's examination, Grant had 15/18 positive fibromyalgia

tender points.  (R. 310, 316).  Dr. Wagner wrote that Grant could ambulate with a stable gait at

an appropriate speed, although she had "an intention tremor and slight balance problems."  (R.

310).  Grant's heel to toe walking was normal bilaterally, but was weak on her right side.  (R.

310, 315).  She demonstrated pain with range of motion testing of her lumbar spine.  (R. 310).

---

[3] The multiaxial system "facilitates comprehensive and systematic evaluation."  Am. Psych. Assn., Diagnostic and Statistical Manual of Mental Disorders 27 (Text Rev. 4th ed. 2000) (hereinafter "DSM IV").

[4] The GAF score represents Axis V of a Multiaxial Assessment system.  *See* DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning."  *Id.* at 32.  The GAF scale is from 1-100.  A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas."  *Id.* at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id.*  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning."  *Id.*

Her grip strength was 5/5 and equal bilaterally, her finger to thumb opposition was adequate, and her fine tactile manipulation of objects was normal.  *Id.*  She demonstrated normal range of motion in her wrists, fingers, and thumbs.  (R. 313). Dr. Wagner's assessments were  chronic sinusitis, fibromyalgia, arthritis, neuropathy, chronic headaches, depression, and tobacco and alcohol abuse.  (R. 310).

Non-examining agency consultant Janet G. Rodgers, M.D., completed a Physical Residual Functional Capacity Assessment on October 7, 2009.  (R. 331-38).  For exertional limitations, Dr. Rodgers found that Grant could perform work at the "medium" level of exertion. (R. 332).  For narrative explanation, Dr. Rodgers noted that Grant had made previous applications and that her assessment was for the time period from August 7, 2008 through the October 7, 2009 date of her assessment.  (R. 332-33).  After listing Grant's claimed impairments, Dr. Rodgers reviewed some of the evidence from records of Dr. Ting, including the normal x-rays from May 26, 2009 and negative blood test results for rheumatoid arthritis.  *Id.*  She recited many aspects of Dr. Wagner's September 24, 2009 report, including that 15 of 18 trigger points were positive.  *Id.*  Dr. Rodgers also stated that Grant's reports of activities of daily living had been inconsistent, and she noted that Grant reported several activities on an agency form.[5]  (R. 333).  Dr. Rodgers specified that her RFC considered Grant's complaints of pain.  *Id.*  Dr. Rodgers found no other limitations.  (R. 333-35).

In an undated Psychiatric Review Technique form, Janice B. Smith, Ph.D., a nonexamining agency consultant, indicated that Grant's mental impairments were not severe.  (R. 317-30).  For Listing 12.04 and Listing 12.06, Dr. Smith noted Grant's adjustment disorder with

---

[5] The form to which Dr. Rodgers referred was apparently an Adult Function Report completed by Grant on August 12, 2009.  (R. 170-77).

mixed anxiety and chronic depressed mood.  (R. 320, 322).  For Listing 12.09, Dr. Smith noted that Grant drank 6-7 beers per day, and that she had a possible Lortab addiction.  (R. 325).  For the "Paragraph B Criteria,"[6] Dr. Smith found no functional limitation.  (R. 327).  In Dr. Smith's consultant's notes, she noted Grant's use of Lortab for pain and Cymbalta for depression.  (R. 329).  Dr. Smith briefly summarized the consultative report of Dr. Morgan dated October 17, 2007 from a prior disability application.  *Id.*  She also mentioned some of the findings of Dr. Wagner.  *Id.*  As had Dr. Rodgers, Dr. Smith noted inconsistencies in Grant's reported activities of daily living.  *Id.*

## Procedural History

Grant filed applications on June 19, 2009 seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*.  (R. 135-45).  Grant alleged onset of disability as August 6, 2008.  (R. 135).  Both of Grant's applications were denied in their entirety initially and on reconsideration.  (R. 72-80, 83-87).  A hearing before ALJ Deborah L. Rose was held on September 16, 2010 in Tulsa, Oklahoma.  (R. 28-67).  By decision dated October 4, 2010, the ALJ found that Grant was not disabled at any time through the date of the decision.  (R. 12-24).  On February 16, 2012, the Appeals Council denied review of the ALJ's findings.  (R. 1-6).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

---

[6] There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment.  The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[7]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

---

[7] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the Agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Grant's date last insured was March 31, 2009. (R. 14). At Step One, the ALJ found that Grant had not engaged in any substantial gainful activity since her alleged onset date of August 6, 2008. *Id.* At Step Two, the ALJ found that Grant had severe impairments of fibromyalgia, asthma, and arthralgias. *Id.* She found Grant's mental impairments were nonsevere. (R. 14-16). At Step Three, the ALJ found that Grant's impairments did not meet a Listing. (R. 16-17).

The ALJ found that Grant had the RFC to perform medium work "except she is only occasionally able to use the non-dominant left upper extremity for hand controls, she is only occasionally able to climb, balance, stoop, kneel, crouch, and crawl, she is only occasionally able to reach overhead with the left non-dominant upper extremity, and she needs to avoid concentrated exposure to respiratory irritants." (R. 17). At Step Four, the ALJ found that Grant was capable of performing some of her past relevant work. (R. 22). As an alternative finding at Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Grant could perform, considering her age, education, work experience, and RFC. *Id.* Thus, the

ALJ found that Grant was not disabled from her alleged onset date of August 6, 2008, through the date of the decision.  (R. 24).

## Review

Grant seeks reversal of the ALJ's decision for several reasons.  First, she contends that the ALJ did not fulfill her duty to develop the record through her failure to order a psychological consultative examination.  Second, she states that the ALJ failed to properly evaluate the medical evidence, and third she contends that the ALJ did not consider all of her impairments throughout the five-step process.  Finally, Grant states that the ALJ's credibility assessment was not valid. The undersigned finds that the ALJ erred in her consideration of the opinion evidence of Dr. Hale and that therefore reversal is required.

A treating physician's opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record.  *Hamlin*, 365 F.3d at 1215; *see also* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  However, even if the ALJ determines that the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed according to the factors set out in Sections 404.1527(d) and 416.927(d).  Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quotation omitted).  While an ALJ need not discuss every factor, he must at least provide "good reasons in [the] decision for the

weight" given to the opinions of a treating physician.  *Oldham v. Astrue*, 509 F.3d 1254, 1258

(10th Cir. 2007).

Dr. Hale saw Grant for the first time on October 19, 2004, and he had available for his

review records, including some that reflected Grant's initial diagnosis of fibromyalgia in 1999 or

2000.  (R. 214-16).  Dr. Hale noted that Grant had previously been referred to a rheumatologist

and had participated in physical therapy with no benefit.  (R. 214).  Grant was taking

hydrocodone, Flexeril, and diphenhydramine at the time of Dr. Hale's examination.  After

examining Grant, Dr. Hale started her on Neurontin "to desensitize the nerve endings."  (R. 215).

He recommended an exercise program, and he stated that he would considering adding Ultracet

to Grant's medications.  *Id.*  At the end of his letter memorializing his examination of Grant, Dr.

Hale stated that:

> it would be appropriate to consider returning [Grant] to work with the restrictions
> recommended by Dr. Pettingell.  These included light duty activities with 10
> pound restricted lifting continuously, 10 pounds restricted pushing and pulling
> continuously with recommendations not to bend or over utilize her left upper
> extremity.

(R. 216).

Dr. Hale and Dr. Gile, another physician in Dr. Hale's office, continued to treat Grant

through July 2006.  Dr. Gile adjusted Grant's medications on several occasions, and he

recommended that she try biofeedback, cognitive therapy, active aerobics, and a muscle

stimulator.  (R. 205-09).  Grant was discharged from the office of Dr. Hale in September 2006,

apparently pursuant to an office policy of referral back to a primary care physician "for continued

care and medication maintenance."  (R. 203-04).

In assessing the opinion evidence given by Dr. Hale as reflected in the October 2004

record, the ALJ gave four reasons for giving that evidence "little weight."  (R. 21).  First, she

said that Dr. Hale treated Grant on only three occasions from October 2004 to February 2005.  *Id.*

Second, she said that his opinion was not consistent with the "relatively routine course of

treatment."  *Id.*  Third, she said that his opinion was not consistent with the recommendations

that several physicians made to Grant that she begin an exercise program.  *Id.*  Finally, she said

that the October 2004 date of this evidence was well before the alleged onset date of August 6,

2008.  *Id.*

  The question is whether these reasons satisfied legal requirements for discounting Dr.

Hale's opinions, including rejection of his exertional limitations that were consistent with

sedentary work.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011) (ALJ must "give good

reasons, tied to the factors specified in the cited regulations for this particular purpose, for the

weight assigned"); *Langley*, 373 F.3d at 1123 (ALJ's reasons for rejecting treating physician

opinion must be sufficiently specific to allow meaningful review).  The first reason, that Dr. Hale

only saw Grant on three occasions, is not sufficient in at least two ways.  First, Dr. Hale

apparently had available medical records for his review when he first began treating Grant in

October 2004, and, indeed, he apparently adopted the restrictions that a previous treating

physician had recommended.  (R. 214-16).  Thus, his opinion given at the time of his first visit

with Grant was not based solely on the information provided by her and by his examination of

her.  The background material Dr. Hale was provided allowed him to base his opinions on the

longitudinal record of Grant's treatment by other doctors.  Second, Dr. Hale's office continued to

treat Grant through July 2006, and Dr. Hale was the physician who signed the letter to Dr. Ting

explaining that his office was discharging Grant back to Dr. Ting's care for continued treatment

of her pain.  (R. 203-13).  Thus, it appears that Dr. Hale considered Grant to be his patient for the

time period of October 2004 through July 2006, even if Grant's care was provided by another

physician in his office for part of that period.  There is also no indication that, throughout the

treating period by Dr. Hale's office, the opinion regarding appropriate restrictions on Grant's

return to work was changed.

The ALJ's second reason, that Dr. Hale's opinions were inconsistent with the course of

treatment, is also insufficient.  First, Dr. Hale explained in February 2005 that he did not find

"there to be anything from an interventional standpoint" that he felt would be beneficial.  (R.

211).  Instead, he viewed his office's role as providing "palliative" care, and he wanted Grant to

do water aerobics in order "to keep her from becoming even more physically deconditioned."  *Id.*

Second, Dr. Hale's office saw Grant regularly, adjusted her medications often, and at one point

apparently provided her with a muscle stimulator, which she found ineffective.  (R. 205-13).  Dr.

Gile explained that fibromyalgia was "most difficult" to treat, and, in addition to the

recommendation of an exercise program, he recommended that Grant try alternative therapies

such as biofeedback and cognitive therapy.  (R. 205).  This evidence reflects that Dr. Hale and

his office gave Grant as much treatment as they could for her fibromyalgia condition, and there is

nothing about the opinion evidence he gave that is inconsistent with this course of treatment.

The ALJ's third reason for discounting Dr. Hale's opinion evidence was that it was

inconsistent with the recommendations of all of the treating physicians that Grant should begin

an exercise program.  (R. 21).  As stated above, Dr. Hale explained early in his treatment of

Grant that he recommended water aerobics so that Grant would not become deconditioned.  (R.

211).  Dr. Gile also explained to Grant that aerobic exercise could potentially decrease her level

of pain.  (R. 206).  Thus, the physicians recommended that Grant should exercise regularly for a

variety of reasons that were all therapeutic.  These therapeutic recommendations do not imply

that Grant had the ability to perform work at an exertional level greater than sedentary work, and

they are not inconsistent with Dr. Hale's opinions that Grant had restrictions on her ability to perform work activities.

Finally, the ALJ said that the fact that Dr. Hale's opinions were given in October 2004, well before the asserted onset date of August 6, 2008, was a reason for discounting those opinions. (R. 21).  In *Andersen v. Astrue*, 319 Fed. Appx. 712 (10th Cir. 2009) (unpublished), the claimant's insured status expired in 1998, and two of his treating physicians gave opinion evidence in 1999 and 2000 regarding the scope of his impairments.  *Id.* at 716, 726-29.  The Tenth Circuit found that the ALJ's discounting of the opinions because they were given outside of the relevant time period was not a specific legitimate reason due to the nature of the opinion evidence.  *Id.*  The opinions did not diagnose a new condition outside of the relevant period, but instead gave evidence of the scope of the impairment, which had been diagnosed within the relevant period.  *Id*.  In the present case, the situation is the reverse of the time situation in *Andersen*, but the Tenth Circuit's analysis is still applicable.  Here, Grant had apparently been diagnosed with fibromyalgia in 1999 or 2000, and in 2004, Dr. Hale accepted that diagnosis and adopted restrictions that had apparently first been made by another physician.  Nothing in the records before this Court indicate that there was an appreciable change for the better in Grant's physical condition and in her fibromyalgia condition that would make the 2004 work restrictions inapplicable.  Indeed, the ALJ did not give any examples to support her implied finding that 2004 was too remote from the 2008 asserted onset date for Dr. Hale's opinions to be inapplicable.  For example, if the ALJ had stated that there was evidence that showed an improvement of Grant's condition between 2004 and 2008, and given examples, that could have buttressed her finding that Dr. Hale's 2004 opinions should be discounted.

Because the Court finds that reversal is required based on the ALJ's failure to give sufficient reasons for discounting the opinion evidence of Dr. Hale, the Court does not take a position on any of the other issues raised by Grant.  The Court notes, however, that the ALJ relied on a psychological consultative examination that was completed before the asserted onset date.  (R. 14-16).  Recently, the Tenth Circuit said that an ALJ's reliance on a "patently stale" opinion was "troubling," and the court encouraged the ALJ to obtain an updated exam or report on remand.  *Chapo v. Astrue*, 682 F.3d 1285, 1293 (10th Cir. 2012).  The undersigned would encourage the Commissioner to consider, on remand, whether the October 2007 consultative examination report of Dr. Morgan is substantial evidence upon which the ALJ can rely given the other, more recent, evidence regarding Grant's mental impairments.  On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Grant.

This Court takes no position on the merits of Grant's disability claim, and "[no] particular result" is ordered on remand.  *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 20th day of September 2013.

Paul J. Cleary
United States Magistrate Judge